563 So.2d 622 (1990)
JOINT VENTURES, INC., Petitioner,
v.
DEPARTMENT OF TRANSPORTATION, Etc., Respondent.
No. 71878.
Supreme Court of Florida.
April 26, 1990.
Rehearing Denied July 27, 1990.
*623 S. Cary Gaylord and Alan E. DeSerio of Brigham, Moore, Gaylor, Wilson, Ulmer, Schuster & Sachs, Tampa, for petitioner.
Maxine F. Ferguson, Appellate Atty., and Thomas H. Bateman, III, General Counsel, Dept. of Transp., Tallahassee, for respondent.
BARKETT, Justice.
We have for review Joint Ventures, Inc. v. Department of Transportation, 519 So.2d 1069 (Fla. 1st DCA 1988), in which the district court asked in a certified question whether subsections 337.241(2) and (3), Florida Statutes (1987), unconstitutionally permit the state to take private property without just compensation.[1] We answer the question in the affirmative, finding those subsections invalid as a violation of the fifth amendment to the United States Constitution and article X, section 6(a) of the Florida Constitution.
Joint Ventures, Inc., owned 8.3 acres of vacant land located adjacent to Dale Mabry Highway in Tampa. Joint Ventures had contracted to sell this property contingent upon the buyer's ability to obtain the permits necessary to develop it. Thereafter, the Department of Transportation (DOT) determined that 6.49 acres of this vacant land was needed for storm water drainage associated with the planned widening of the highway. In November 1985, DOT recorded a map of reservation in accordance with subsection 337.241(1), Florida Statutes (1987).[2] DOT's recordation of the map of reservation precluded the issuance of development permits for this property under subsection 337.241(2):
Upon recording [the map of reservation], such map shall establish:
(a) A building setback line from the centerline of any road existing as of the date of such recording; and no development permits, as defined in s. 380.031(4),[[3]] shall be granted by any governmental entity for new construction of any type or for renovation of an existing commercial structure that exceeds 20 percent of the appraised value of the structure. No restriction shall be placed on the renovation or improvement of existing residential structures, as long as such structures continue to be used as private residences.
(b) An area of proposed road construction within which development permits, as defined in s. 380.031(4), shall not be issued for a period of 5 years from the date of recording such map. The 5-year period may be extended for an additional 5-year period by the same procedure set forth in subsection (1).

(Emphasis supplied.)
Joint Ventures contested DOT's reservation in an administrative hearing pursuant *624 to subsection 337.241(3).[4] The hearing officer found against Joint Ventures and DOT later adopted the officer's findings and conclusions in a Final Order. On appeal to the district court, Joint Ventures argued that the moratorium imposed by section 337.241(2) amounted to a taking because the statute deprived it of substantial beneficial use of its property.
In opposition, DOT contended that the legislature did not "take" but merely "regulated" in a valid exercise of the police power. The district court concluded that the challenged subsections were constitutional because Joint Ventures had a remedy by way of an action for inverse condemnation.[5]
Generally, the state must pay property owners under two circumstances. First, the state must pay when it confiscates private property for common use under its power of eminent domain. Second, the state must pay when it regulates private property under its police power in such a manner that the regulation effectively deprives the owner of the economically viable use of that property,[6] thereby unfairly imposing the burden of providing for the public welfare upon the affected owner.[7]
Under the power of eminent domain, the state has the inherent right to take private property for public use without the consent of the owner. Shavers v. Duval County, 73 So.2d 684, 688 (Fla. 1954). In so doing, the state is obliged to make full compensation.[8] Indeed, the Florida Legislature has implemented a complete statutory scheme in chapters 73 and 74, Florida Statutes (1987), to assure the payment of such compensation.
However, as Justice Holmes recognized, the "seemingly absolute protection" of required compensation is "qualified" by another inherent power of the state, the police power. Pennsylvania Coal Co. v. Mahon, *625 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Although both powers impact on private property, there is a distinction between the power of eminent domain and the police power:
[T]he former involves the taking of property because of its need for the public use while the latter involves the regulation of such property to prevent its use thereof in a manner that is detrimental to the public interest.
J. Sackman, Nichols' The Law of Eminent Domain § 1.42, at 1-133 to 1-134 (rev. 3rd ed. 1988) (footnotes omitted, emphasis in original).
Although regulation under the police power will always interfere to some degree with property use, compensation must be paid only when that interference deprives the owner of substantial economic use of his or her property. In effect, this deprivation has been deemed a "taking." Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978). Thus, when compensation is claimed due to governmental regulation of property, the appropriate inquiry is directed to the extent of the interference or deprivation of economic use.
Here, however, we do not deal with a claim for compensation, but with a constitutional challenge to the statutory mechanism. Our inquiry requires that we determine whether the statute is an appropriate regulation under the police power, as DOT asserts, or whether the statute is merely an attempt to circumvent the constitutional and statutory protections afforded private property ownership under the principles of eminent domain.
Under its police power, the state is deemed to enact laws for the protection of the general welfare, that is, the public safety, health, morals, comfort, and general well being. Hav-A-Tampa Cigar Co. v. Johnson, 149 Fla. 148, 159, 5 So.2d 433, 437 (1941).[9] In the broad sense, when the state "takes" property, whether through its police power or power of eminent domain, it does so to promote the general welfare. Analytically, the two have been discussed in different terms. Regulation is analyzed in terms of the exercise of police power, whereas acquisition is analyzed in terms of the state's power of eminent domain.[10]First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987); Agins, 447 U.S. at 260, 100 S.Ct. at 2141; Penn Cent. Transp. Co., 438 U.S. at 136, 98 S.Ct. at 2665; Pennsylvania Coal Co., 260 U.S. at 413, 43 S.Ct. at 159; art. X, § 6(a), Fla. Const.
In this case, DOT suggests that section 337.241 is a permissible regulatory exercise of the state's police power because it was necessary for various economic reasons. For example, without a development moratorium, land acquisition costs could become financially infeasible. If landowners were permitted to build in a transportation corridor during the period of DOT's preacquisition planning, the cost of acquisition might be increased. Rather than supporting a "regulatory" characterization, these circumstances expose the statutory scheme as a thinly veiled attempt to "acquire" land by avoiding the legislatively mandated procedural and substantive protections of chapters 73 and 74.
We find analogous the distinction drawn by the court in San Antonio River Authority v. Garrett Brothers, 528 S.W.2d 266, 273-74 (Tex. Ct. App. 1975):

*626 [I]n exercising the police power, the governmental agency is acting as an arbiter of disputes among groups and individuals for the purpose of resolving conflicts among competing interests. This is the role in which government acts when it adopts zoning ordinances, enacts health measures, adopts building codes, abates nuisances, or adopts a host of other regulations... . But where the purpose of the governmental action is the prevention of development of land that would increase the cost of a planned future acquisition of such land by government, the situation is patently different. Where government acts in this context, it can no longer pretend to be acting as a neutral arbiter. It is no longer an impartial weigher of the merits of competing interest among its citizens. Instead, it has placed a heavy governmental thumb on the scales to insure that in the forthcoming dispute between it and one, or more, of its citizens, the scales will tip in its own favor... . To permit government, as a prospective purchaser of land, to give itself such an advantage is clearly inconsistent with the doctrine that the cost of community benefits should be distributed impartially among members of the community.
Indeed, the legislative staff analysis candidly indicates that the statute's purpose is not to prevent an injurious use of private property, but rather to reduce the cost of acquisition should the state later decide to condemn the property. Staff of Fla.H.R. Comm. on Transp., H.B. 314 (1985) Staff Analysis (March 25, 1985).
We perceive no valid distinction between "freezing" property in this fashion and deliberately attempting to depress land values in anticipation of eminent domain proceedings. Such action has been consistently prohibited. Board of Comm'rs v. Tallahassee Bank & Trust Co., 108 So.2d 74, 86 (Fla. 1st DCA 1958), writ quashed, 116 So.2d 762 (Fla. 1959). Accord Kissinger v. City of Los Angeles, 161 Cal. App.2d 454, 462, 327 P.2d 10, 16 (1958); Robyns v. City of Dearborn, 341 Mich. 495, 499, 67 N.W.2d 718, 720 (1954); Long v. City of Highland Park, 329 Mich. 146, 153, 45 N.W.2d 10, 13 (1950); Grand Trunk W.R.R. Co. v. City of Detroit, 326 Mich. 387, 396-97, 40 N.W.2d 195, 199 (1949); State ex rel. Tingley v. Gurda, 209 Wis. 63, 70, 243 N.W. 317, 320 (1932).
We do not question the reasonableness of the state's goal to facilitate the general welfare. Rather we are concerned here with the means by which the legislature attempts to achieve that goal. Here, the means are not consistent with the constitution. We acknowledge that the state may properly attempt to economize the expenditure of public funds. As DOT notes, in Department of Transportation v. Fortune Federal Savings and Loan Association, 532 So.2d 1267 (Fla. 1988), we considered whether the state constitutionally could condemn an entire parcel when it required only a portion of the parcel. There was no constitutional violation when the state, acting pursuant to statute, actually spent less by condemning the entire parcel than it would have spent by condemning only the required portion. In Fortune Federal, the state sought to economize in a legitimate fashion after it had commenced condemnation proceedings through its power of eminent domain. It would be an unwarranted extension of Fortune Federal to conclude that the state may deliberately restrict land use under its police power before the commencement of condemnation proceedings without the duty of compensation. The state may not use its police power in such a manner. Board of Comm'rs. Accord Kissinger; Robyns; Long; Grand Trunk W.R.R. Co.; State ex rel. Tingley. Fortune Federal is inapposite in this context.
We are also unpersuaded by DOT's reliance upon Southern Bell Telephone & Telegraph Co. v. State ex rel. Ervin, 75 So.2d 796 (Fla. 1954). There, Southern Bell contended that the cost of removing and relocating its equipment made necessary by a highway expansion project ought to be borne by the State Road Department. The Court noted that the influx of automobiles in this country "makes safe, adequate highways ... one of the clearest fields for the exercise of the police power." Id. at 799. *627 No one disputes that the state may exercise its power to achieve highway safety. Here, however, the state exercised its police power with a mind toward property acquisition. Assuring highway safety and acquiring land for highway construction are discrete state functions.
DOT contends that Joint Ventures' right to seek compensation through inverse condemnation cures the statute's failure to expressly provide for compensation. We disagree. Although the right to seek relief through inverse condemnation is implied in the constitution and a compensation provision need not be expressly included for an owner to be entitled to such compensation, see First English,[11] that remedy is not equivalent to a property owner's remedy under the doctrine of eminent domain. Inverse condemnation affords the affected property owner an after-the-fact remedy, when there has already been a "taking" by regulation,[12] and it is not a substitute for eminent domain protection facilitated by chapters 73 and 74.
The property owner who must resort to inverse condemnation is not on equal footing with an owner whose land is "taken" through formal condemnation proceedings. The former has the burden of seeking compensation, must initiate the inverse condemnation suit,[13] and must finance the costs of litigation without the procedural protections afforded the condemnee. In State Road Department v. Forehand, 56 So.2d 901, 903 (Fla. 1952), the Court considered the due process requirements of the state's summary method of securing possession of property pending condemnation proceedings:
Notice to the parties, the appointment of appraisers, the submission of testimony, the right to be represented by counsel and a determination by the court of whether or not these things have been done are all required before possession of the land is turned over to the petitioner, including a deposit in the registry of the court of no less than twice its appraised value.
See also United States v. Clarke, 445 U.S. 253, 255, 100 S.Ct. 1127, 1129, 63 L.Ed.2d 373 (1980) (recognizing that important legal and practical differences exist between the two proceedings); Department of Transp. v. Grossman, 536 So.2d 1181 (Fla. 3d DCA) (the condemnor, not the landowner, has the burden to proceed under chapter 74), review denied, 545 So.2d 1366 (Fla. 1989).
DOT's claim that subsection 337.241(3) is a procedural cure for the shortcomings of subsection 337.241(2) is unavailing. Subsection (3) merely enables a property owner to challenge a regulation as an unreasonable or arbitrary exercise of police power. A reasonable regulation may, however, amount to a "taking." Pennsylvania Coal Co., 260 U.S. at 393, 43 S.Ct. at 158 (cited *628 with approval in Department of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc., 521 So.2d 101, 103 (Fla. 1988)). Under these circumstances the remedial protections of subsection 337.241(3) are illusory.
Accordingly, we answer the certified question in the affirmative and quash the opinion of the district court.
It is so ordered.
SHAW, GRIMES and KOGAN, JJ., concur.
EHRLICH, C.J., dissents with an opinion, in which OVERTON and McDONALD, JJ., concur.
EHRLICH, Chief Justice, dissenting.
The majority holds that subsections 337.241(2) and (3), Florida Statutes (1987), are facially unconstitutional because they permit the state to take private property without just compensation or the procedural protections of the eminent domain statute. I must disagree.
A "taking" occurs when the government by its action deprives a landowner of substantially all beneficial or economically viable use of his property. See Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). If there is a taking, the constitutions of the United States and the state of Florida require that just and full compensation be paid. U.S. Const. amend. V; art. X, § 6(a), Fla. Const. In order for this Court to find subsections 337.241(2) and (3) facially unconstitutional, every conceivable application of those subsections must be unconstitutional, i.e., effect a "taking" of private property without just compensation. Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984). This is simply not the case.
Although in most circumstances imposition of a map of reservation on vacant land will deprive the owner of substantially all beneficial use of the property, it cannot be said that every conceivable application of this statute will effect a taking. Subsections 337.241(2) and (3) apply to all types of land, from residential to commercial, whether vacant or improved. Application of this statute to land with existing structures which are in use likely will not effect a taking, because this statute permits continued use of and virtually unlimited renovation of existing residential structures, and renovation of existing commercial structures up to twenty percent of the appraised value of the structure. As it is only by analysis of each circumstance in which the statute is applied that it can be determined if a taking has occurred, the statute cannot be unconstitutional on its face.
Confusion as to the operation of the statute underlies the whole of the majority's analysis. The majority apparently acknowledges the goals of this statute to promote highway safety and to save the state money, and that those goals legitimately promote the general welfare of the state. However, the majority finds fault with the statute because it restricts land use prior to commencement of compensation proceedings and without paying compensation to the land owner. However, in circumstances such as those discussed above where the restrictions do not deprive the owner of substantially all beneficial use of his property, there is no taking, and no constitutional right to compensation.
Further, it is not constitutionally required that explicit provision be made in the statute for compensation to be paid in those circumstances where application of the statute effects a taking, because the owner has the right to file an inverse condemnation action. The right was reaffirmed in First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), and was applied to takings resulting from government regulatory action similar to that in this case. The United States Supreme Court considered an ordinance which provided that "`[a] person shall not construct, reconstruct, place or enlarge any building or structure, any portion of which is, or will be, located within the outer *629 boundary lines of the interim flood protection area,'" id. 107 S.Ct. at 2381, but did not provide for compensation to be paid to affected landowners. The Court noted that the right to bring an inverse condemnation suit is based on the "self-executing" nature of the just compensation clause:
"The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty imposed by the Amendment."

Id. at 2386 (emphasis added) (quoting Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933)). Further, the Court in First English explicitly recognized that "[w]hile the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." 107 S.Ct. at 2386. While I agree that "[i]nverse condemnation affords the affected property owner an after-the-fact remedy, when there has already been a `taking' by regulation," majority op. at 627, and it is true that under inverse condemnation it is the property owner who has the burden of seeking condemnation, the majority does not explain why this remedy is not constitutionally sufficient if the statute otherwise provides basic due process protections.
Due process is required whenever the government takes property, as that is a deprivation of property under the due process clauses of the United States and Florida Constitutions. U.S. Const. amends. V, XIV; art. I, § 9, Fla. Const. However, in the context of eminent domain, due process requires only that the property owner be given reasonable notice and an opportunity to be heard. Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930). The legislature has great discretion to determine the applicable procedure as long as that procedure is adequate to provide just compensation and satisfies the demands of due process and equal protection. Crane v. Hahlo, 258 U.S. 142, 42 S.Ct. 214, 66 L.Ed. 514 (1922). The additional protections afforded in the Florida eminent domain statutes, chapters 73 and 74, Florida Statutes (1987), are statutory in nature and are not mandated by either the Florida or federal constitutions.
The Fifth Circuit Court of Appeals recognized the sufficiency of inverse condemnation as a remedy in United States v. 101.88 Acres of Land, 616 F.2d 762, 772 (5th Cir.1980):
[A] condemnation proceeding exists for the purpose of allowing the sovereign expeditiously to acquire precisely the interest in land that it believes is required for some project it will carry out and to pay the landowner compensation for only those interests it has acquired, plus any damages that flow directly from the acquisition itself. The sovereign need not, of course, first proceed by formal condemnation. It may use land and leave the landowner to ask the courts to award just compensation under a theory of inverse condemnation. Or it may proceed by formal condemnation and inverse condemnation simultaneously... . The 5th Amendment, while it guarantees that compensation be just, does not guarantee that it be meted out in a way more convenient to the landowner than to the sovereign.

(Emphasis added.) The fact that there are procedural differences between condemnation under eminent domain and inverse condemnation does not in itself make the latter deficient as a remedy so long as the basic constitutional requirements are met. See also Port of New York Authority v. Heming, 34 N.J. 144, 167 A.2d 609 ("The Legislature may establish alternate procedures [for condemnation] which may be resorted to at the election of the condemnor provided each procedure itself meets the demands of due process and equal protection."), cert. denied, 367 U.S. 487, 81 S.Ct. 1676, 6 L.Ed.2d 1241 (1961).
*630 State Road Department v. Forehand, 56 So.2d 901 (Fla. 1952), cited by the majority, does indeed stand for the proposition that a taking must accord with due process. However, the portion of that case quoted in the majority opinion, majority op. at 626, when read in context, is not a statement by this Court of the procedure required by due process, but instead is merely a recital of the provisions of chapter 74, Florida Statutes, the statute at issue in that case. Forehand does not stand for the proposition that due process requires the full range of protections provided in the eminent domain statutes, chapters 73 and 74, Florida Statutes.[*]
The statute at issue provides for reasonable notice and opportunity for the owner to challenge the agency action, thereby satisfying the requirements of due process. Prior to the filing of the map of reservation, a public hearing is required to be advertised and held, with notification to all affected property owners at least twenty days prior to that hearing. After the map is filed, the owner may challenge the action itself as unreasonable or arbitrary and because it denies a substantial portion of the beneficial use of the property in an administrative hearing pursuant to chapter 120, Florida Statutes (1987). If the owner's challenge is successful, the department has 180 days to acquire the property or file a condemnation proceeding. § 337.241(3), Fla. Stat. The district court below may be correct that if this procedure were the only means by which the owner could receive relief, then the statute would be unconstitutional. However, this is not the case; the statute does not expressly prohibit the payment of compensation, and the United States Supreme Court has clearly found that a person whose property is "taken," even temporarily, as the result of government regulation may sue for compensation in inverse condemnation. First English. Moreover, if the property owner files an inverse condemnation action and the court determines that a taking has occurred, then the owner is entitled to reasonable attorney's fees, as he would be in a condemnation proceeding instituted by the government. See State Road Dept. v. Lewis, 190 So.2d 598, 600 (Fla. 1st DCA) (It would be absurd that if the department "complies with the law of this state by instituting an eminent domain action, it is liabile for attorney's fees; but if it unlawfully appropriates a citizen's property without instituting such an action, it thus escapes liability for the attorney's fees incurred by the aggrieved owner."), cert. dismissed, 192 So.2d 499 (Fla. 1966). Therefore, a valid mechanism exists for the payment of compensation, and the federal and Florida constitutions are satisfied. Further, where, as here, the government action is a regulation that will effect a taking only in certain circumstances, it is unreasonable and illogical to require the institution of formal condemnation proceedings in every case.
For the foregoing reasons, I would answer the certified question in the negative and approve the decision of the district court below.
OVERTON and McDONALD, JJ., concur.
NOTES
[1] The question which the district court certified to be of great public importance is:

Whether subsections 337.241(2) and (3) are unconstitutional in that they provide for an impermissible taking of property without just compensation and deny equal protection and due process in failing to provide an adequate remedy.
Joint Ventures, Inc. v. Department of Transp., 519 So.2d 1069, 1072 (Fla. 1st DCA 1988). We have discretionary jurisdiction. Art. V, § 3(b)(4), Fla. Const.
[2] Subsection 337.241(1), Florida Statutes (1987), provides in part:

The department ... shall acquire all rights-of-way and may prepare and record maps of reservation for any road within its jurisdiction... . Any such maps shall delineate the limits of proposed rights-of-way for the eventual widening of an existing road... .
[3] A development permit "includes any building permit, zoning permit, plat approval, or rezoning, certification, variance, or other action having the effect of permitting development as defined in this chapter." § 380.031(4), Fla. Stat. (1987).
[4] Subsection 337.241(3), Florida Statutes (1987), provides in part:

Upon petition by an affected property owner alleging that such property regulation is unreasonable or arbitrary and that its effect is to deny a substantial portion of the beneficial use of such property, the department ... shall hold an administrative hearing in accordance with the provisions of chapter 120. When such a hearing results in an order finding in favor of the petitioning property owner, the department ... shall have 180 days from the date of such order to acquire such property or file appropriate proceedings. Appellate review by either party may be resorted to, but such review will not affect the 180-day limitation when such appeal is taken by the department ... unless execution of such order is stayed by the appellate court having jurisdiction.
[5] During the pendency of that appeal, DOT condemned the land, and the parties entered into a monetary settlement. The district court decided that the great public importance and the likely recurrence of the issues preserved its jurisdiction despite the settlement.
[6] Palm Beach County v. Tessler, 538 So.2d 846, 849 (Fla. 1989) ("There is a right to be compensated through inverse condemnation when governmental action causes a substantial loss of access to one's property even though there is no physical appropriation of the property itself.") (emphasis supplied); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 485, 107 S.Ct. 1232, 1238, 94 L.Ed.2d 472 (1987); Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). See also J. Sackman, Nichols' The Law of Eminent Domain § 6.09, at 6-55 (rev. 3rd ed. 1985) ("The modern, prevailing view is that any substantial interference with private property which destroys or lessens its value ... is, in fact and in law, a `taking' in a constitutional sense." (Emphasis supplied.)).
[7] The fifth amendment protections exist to prevent government "`from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 3147 n. 4, 97 L.Ed.2d 677 (1987) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).
[8] A limitation on the exercise of the power of eminent domain is contained in the fifth amendment which provides that "private property [shall not] be taken for public use, without just compensation." That protection applies to the states through the fourteenth amendment. Chicago, B. & Q.R.R. v. City of Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). Florida's Constitution includes a similar limitation: "No private property shall be taken except for a public purpose and with full compensation." Art. X, § 6(a), Fla. Const.
[9] To be valid, a regulation must be rationally related to the advancement of that end. A use restriction which fails to substantially advance a legitimate state interest may result in a "taking." Keystone Bituminous Coal Ass'n; Agins. Furthermore, in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 127, 98 S.Ct. 2646, 2660, 57 L.Ed.2d 631 (1978), the Court opined that "a use restriction on real property may constitute a `taking' if not reasonably necessary to the effectuation of a substantial public purpose" (citation omitted).
[10] The power of eminent domain derives from the same source as the police power, to wit, the power based upon the sovereignty of the state. Sackman, supra note 6, § 1.14, at 1-22 to 1-23.
[11] There, the church was prohibited by ordinance from constructing on its property because the property was located within an interim flood protection area. The church filed a complaint which, in part, sought to recover in inverse condemnation. The issue before the Court was whether the fifth amendment's just compensation clause required the government to pay for "temporary" regulatory takings in inverse condemnation. The Court held that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987). The Church did not argue, nor did the Court consider, whether the challenged ordinance was constitutionally valid. Thus, First English offers no guidance to our resolution of the constitutional challenge against subsection 337.241(2) and (3), Florida Statutes (1987).
[12] Schick v. Florida Dept. of Agric., 504 So.2d 1318, 1319 (Fla. 1st DCA) ("a cause of action for inverse condemnation will lie against a government agency, which, by its conduct or activities, has taken private property without a formal exercise of the power of eminent domain"), review denied, 513 So.2d 1060 (Fla. 1987); Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663, 669 (Fla.) (Florida's Constitution recognizes a right of the owner to compel compensation when his property is appropriated for public use), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 377 (1979).
[13] Moreover, subsection 337.241(2) permits the development moratorium to last as long as ten years, after which DOT could abandon its road building plans and forego condemnation proceedings.
[*] United States v. Clarke, 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980), cited by the majority, discussed the legal and practical differences between condemnation under eminent domain and inverse condemnation in the context of interpreting 25 U.S.C. § 357. The Court determined that the term "condemned" as used in the statute did not include inverse condemnation based solely on statutory interpretation, and not because inverse condemnation was in any way constitutionally deficient.