601 So.2d 1223 (1992)
Billie A. VATALARO, Appellant,
v.
DEPARTMENT OF ENVIRONMENTAL REGULATION, Appellee.
No. 91-2132.
District Court of Appeal of Florida, Fifth District.
May 29, 1992.
Rehearing Denied July 14, 1992.
*1224 Richard L. Baldy and Michael D. Jones of Michael D. Jones, P.A., Winter Springs, for appellant.
Steven A. Medina, Tallahassee, for appellee.
GOSHORN, Chief Judge.
Appellants[1] appeal the order of final summary judgment in favor of appellee Department of Environmental Regulation (DER). Billie Vatalaro filed this inverse condemnation suit against DER claiming the agency deprived her of all economically viable or reasonable uses of her property after it denied her a dredge and fill permit. Summary judgment was granted on the grounds that DER's refusal to issue a permit to dredge and fill on the property "did not frustrate a reasonable and distinct investment backed expectation" and "because the applicable regulations existed at the time the property was purchased, no unconstitutional diminution in fair market value can be attributed to the permit denial." We reverse.[2]
On July 16, 1986, Vatalaro purchased two lots comprising approximately 11 acres on Lake Rouse in Orange County. Approximately five acres are in the lake itself. Vatalaro was an elderly woman in declining *1225 health and intended to build two houses on the site  one for herself and one for her daughter because she needed someone nearby to look after her. She paid over $125,000 for the property because she loved its trees. The property was zoned residential and its sellers told her there would be no problem building. When asked what she saw that confirmed her belief that the property was suitable for building two residences, Vatalaro replied that she looked at the property herself. Prior to the purchase, Vatalaro also directed her son, Ronald Vatalaro, a certified general contractor, certified building inspector, certified plans reviewer, and chief building inspector for Orange County, to inspect the property and investigate pertinent building regulations and requirements. Ronald conducted a survey of the property and took soil samples prior to purchase. The survey and soil samples satisfied him that the property was suitable for construction. Subsequent to the purchase, he conducted a very thorough check of existing county regulations and began applying for the requisite building permits. The Orange County Environmental Protection Agency informed him that part of the property was in a conservation area. He did not inquire of the St. Johns Water Management District or DER as to whether they might have some type of jurisdiction over the property. He thought DER only handled pollution problems and was unfamiliar with the Warren S. Henderson Wetlands Protection Act of 1984[3] at the time his mother purchased the property.
Another of Vatalaro's sons, Russell Vatalaro, made inquiries with the Building Department, the Planning Department, the Zoning Department, and the Orange County Environmental Protection Agency prior to the purchase to determine what restrictions were on the property. Everyone told him the property was zoned R-1. He was not informed of any wetland restrictions; DER was never mentioned.
In January of 1988, Orange County issued building permits and septic tank permits for two houses on approximately one-half acre. In early February 1988, the Orange County Environmental Protection Agency requested the involvement of DER. After conducting an on-site inspection of the premises, DER personnel determined that the property was within a 20 acre wetland contiguous with Lake Rouse and thus jurisdictional. DER then required Vatalaro to apply for a dredge and fill permit. She did apply for a permit to build a private residence with a septic tank. DER made the following observations in its final order denying the permit:
The current condition of this wetland is excellent.
The department hereby denies the permit for the following reasons:
Pursuant to Section 403.918(2), F.S., in order to determine whether the applicant has provided the department with reasonable assurance that the project is not contrary to the public interest, seven criteria are to be considered and balanced. Although all seven criteria have been considered in processing of this application, the criteria most applicable to this type of project are paragraphs (2), (5), and (7) of Section 403.918(2), F.S.
The wetland where proposed construction is to occur is the only wetland contiguous to Lake Rouse. It has an essential filtration function which provides an important contribution to maintenance of water quality within Lake Rouse and within the region in which [it] is located. The Lake Rouse wetland provides flood abatement capacity via its soils and plants. It provides both increased water residence time and absorption of water volume. This function has been lost from several of the severely impacted wetlands along the corridors adjacent to State Road 50. The cumulative effects of pre-Henderson Act construction activities have now become evident in several of the other wetlands still standing in this region. Within this section of east Orange County the majority of the wetland *1226 hydroperiods have been altered. The result has been progressive soil oxidation and invasion by exotic or less desirable species. Such altered soils no longer are able to provide their pre-encroachment water holding capacities.
Because the hydroperiod of the wetland is intact and the tree canopy is mature, the Lake Rouse wetland is important to the region in which it is located. This wetland is an exception among wetlands in this area and by virtue of both its excellent condition and location provides many additional functions other than filtration and flood abatement.
Wildlife which are residents of the area utilize such a wetland for food, cover, resting and nesting. The Lake Rouse wetland contains many useful food sources such as (but not limited to) holly, utilized by raccoons, deer, opossums and birds; salvinia, a favorite of ducks; cypress, utilized by ducks and many birds; and bay, utilized by a variety of birds. Wildlife which are not permanent residents of the area are able to use the area as a stopover in a corridor with little else in a condition to accommodate them. The fill which has already been placed in this wetland has decreased the carrying capacity in a region where there are currently severe habitat limitations.
Also, construction in wetlands areas typically entails removal of unstable soils before fill is placed. Removal of wetland soils constitutes removal of the chemical storage area for the wetland. In non riverine systems such sources are difficult to replace.
Clearing the forested wetland leads to more far reaching impacts than loss of habitat alone. The clearing and filling opens the canopy. The open canopy allows the process of oxidation to start, soil changes take place and soil subsidence occurs leading to additional lateral tree canopy loss. Invader species gradually begin to encroach as the soils which are oxidizing lose their valuable water holding capacities. Hydroperiod gradually is altered. The impacts which have been described above are significant negative environmental impacts which alone place the project in negative balance.
The placement of a septic tank within wetlands is of serious concern. Even if a mounded septic system is utilized, water quality problems within the lake, canal or wetland may occur. It is a characteristic of wetlands and lakes that the water levels rise and fall in relation to rainfall, other surface water input, and ground water fluctuations. At the present time the scientific knowledge of the intricate relationship between these factors is not complete. This has recently been demonstrated in west Orange county where levels of water in lakes and wetlands have risen precipitously over the last several years and led to flooding of homes and septic tanks. Although the topography differs from east to west Orange County, the issue is similar. Florida characteristically has periods which are relatively more dry and then returns to periods of heavier rainfall. It is anticipated due to the natural history of the region in which the project site is located, that standing water and saturated soil conditions may be present over the site from June through November. However, it should be noted that standing water was observed onsite in February 1988. The percolation of the septic system may be expected to provide a new nutrient source into an oligotrophic system which may lead to water quality problems. Therefore, the applicant has not provided reasonable assurance, pursuant to Section 403.918(1), F.S., that the project will not result in violations of state water quality standards, specifically nutrients (Rule 17-3.121(19), F.A.C.).
Additionally it was not made clear in the application and additional information received that a further impact to the wetland (via fill and/or clearing) would be necessary to construct the septic system.
In discussions with Mr. Ron Vatalaro during the July field inspection, he indicated that an additional portion of the wetland would be used for the septic tank and drainfield area. Even without respect to the septic tank issue, the *1227 project remains in negative balance due to the anticipated impacts.
In addition to the anticipated adverse affects [sic] resulting from this project on this portion of the wetland, there is the concern of similar projects in similar wetlands and lakes. [Emphasis in original]. From the standpoint of cumulative impact, pursuant to Section 403.919, F.S., large-scale loss of wetlands (and their use as wildlife habitat and flood attenuation systems) and further degradation of waterbodies could be expected.
The department offers the following modifications:
Restoration of the cleared and filled area is recommended in order to preserve the integrity of this entire wetland. The area is compatible with light recreational uses, therefore, an elevated wooden boardwalk through a limited portion of the property would be permittable. This boardwalk should be constructed so as to avoid removal of the canopy or removal of the natural soils. The impacts of outright deforestation and filling in this area would not be compensated by mitigation (such as wetland creation) for a [sic] least 50-75 years after planting of a forested area. The mitigation ratio would also be extremely high for wetland creation, and higher for enhancement. Lake Rouse is at the edge of the drainage basin divide between the Little Econlockhatchee and Econlockhatchee Rivers and there would not be an appropriate area in which to place a mitigation site. [Emphasis added].
Vatalaro appealed the denial of permit and an administrative hearing was held. The hearing officer recommended upholding the denial of permit. The recommended order was adopted in its entirety by DER. Vatalaro then filed suit against DER, for inverse condemnation. Summary final judgment was entered in favor of DER. This appeal followed.[4]
Appellants argue they have been denied all economically viable, beneficial and reasonable uses of the property because of the permit denial, and hence a taking has occurred. Over $125,000 was paid for the property with the anticipation of building two homes thereon. DER offered one permissible alternative use: restoration of the cleared and filled area and construction of an elevated wooden boardwalk through a limited portion of the property. DER has precluded appellants from making any use of the land other than "passive recreational."[5] Appellants assert the effect of the denial is to prevent all use of the land because even the boardwalk suggested by DER is impermissible under Orange County Code.
There is no set formula for determining whether economic injury caused by public action is a compensable taking. Ruckelshaus v. Monsanto Company, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). A general zoning law, as applied to a specific piece of property, effects a taking if (a) it does not substantially advance a legitimate state interest or (b) it denies an owner economically viable use of his land. Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); Orlando/Orange *1228 County Expressway Authority v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA), review denied, 591 So.2d 183 (Fla. 1991). If a taking is established, the Constitutions of the United States and the State of Florida require that just and full compensation be paid. U.S. Const. amend. V; Art. X, § 6(a), Fla. Const. The inquiry into whether a taking has occurred is done on a case by case basis.
In Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1380 (Fla.), cert. denied sub nom. Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981), the court listed factors to be considered in deciding whether a taking occurred:
1. Whether there is a physical invasion of the property.
2. The degree to which there is a diminution in value of the property. Or stated another way, whether the regulation precludes all economically reasonable use of the property.
3. Whether the regulation confers a public benefit or prevents a public harm.
4. Whether the regulation promotes the health, safety, welfare, or morals of the public.
5. Whether the regulation is arbitrarily and capriciously applied.
6. The extent to which the regulation curtails investment-backed expectations.
In Graham, the supreme court held that the denial of a permit to destroy 1800 acres of black mangroves, leaving the owner with 2800 acres and reducing by half the number of housing units the owner intended to build, was not a taking, but was instead a valid exercise of police power to prevent a public harm. In contrast to the facts in Graham, the owner sub judice was left with no economically viable uses of the land. Even a regulation that complies with the standards for the exercise of police power may still result in a taking. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (holding that the application of a statute prohibiting subsurface mining left the coal company's rights to underground minerals worthless and constituted a taking).
In United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Army Corps of Engineers filed suit seeking to enjoin Riverside from filling its property without permission from the Corps. The Court discussed how government land use regulations may "under extreme circumstances" amount to a taking of the subject land. Id. 474 U.S. at 126, 106 S.Ct. at 459. Even if a permit is denied there may be other viable uses available to the owner. "Only when a permit is denied and the effect of the denial is to prevent `economically viable' use of the land in question can it be said that a taking has occurred." Id. 474 U.S. at 127, 106 S.Ct. at 459. "Whether the denial of a permit would constitute a taking in any given case would depend upon the effect of the denial on the owner's ability to put the property to productive use." Id. n. 4. See also Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622, 624 (Fla. 1990) (holding that the state is obligated to pay property owners "when it regulates private property under its police power in such a manner that the regulation effectively deprives the owner of the economically viable use of that property").
It cannot be concluded that a permit denial has not resulted in a taking merely on the basis that the property continues to exist in the state in which it was acquired. Certainly the land is physically unchanged by a permit denial, yet the bundle of rights the owner had has been diminished.[6] The owner no longer has the right to own and enjoy the property as he intended. The extent to which this right has been diminished is the test for determining whether a taking occurred. See Penn Central Transportation Company v. City of New York, 438 U.S. 104, 130-31, 98 S.Ct. *1229 2646, 2662, 57 L.Ed.2d 631 (1978);[7]Joint Ventures, 563 So.2d at 625.
In the case at bar, all economically viable use of the property has been taken. A home cannot be constructed on it, or anything else for that matter. The language used in denying the permit makes it clear that use of the subject land is limited to just looking at it. Apparently even walking across the land is destructive to its delicate balance, as the construction of a boardwalk was suggested. This result falls within the contemplation of the cases finding a taking where all economically viable uses of the property has been prevented.
DER argues that because appellants purchased their property after the enactment of the Warren S. Henderson Wetlands Protection Act of 1984, they were constructively aware that their property was subject to the provisions of the act and did not suffer a compensable taking. While this argument would have merit in a case involving the denial of a rezoning or variance application, its logic fails in a case such as the instant one involving a permit denial. In the former type of case, where the owner purchases land zoned in one classification with the intent or expectation of obtaining a change in zoning and is unsuccessful, nothing has been "taken" from him. Status quo has simply been maintained. His bundle of property rights is as he purchased it. However, in cases like the one at bar involving permit regulations, the land is purchased with future development legitimately anticipated and with no existing bar thereto. Even after DER has issued a jurisdictional declaratory statement pursuant to section 403.914, Florida Statutes (1991), it remains to be determined whether the permit will be granted. We hold that no taking occurred until DER denied Vatalaro's permit application and determined the property was suitable only for limited passive recreational use.
Admittedly, an owner has no absolute right to change the character of his land if the change injures the public. See Graham, 399 So.2d at 1382. That is the very basis for the requirement that the owner obtain a permit if the owner intends to change the character of the land in question by filling it. The permit request may be granted, conditionally granted, or denied. Because even a denial may not prevent all economically viable use of the land, a taking does not occur automatically with every denial. Riverside, 474 U.S. at 127, 106 S.Ct. at 459. Generally, the denial will not render the land useless in the economic sense. Although development of one segment of rights or uses of the property has been precluded, other uses may continue to exist. If so, no taking has occurred. On the other hand, where the owner is left with no viable economic use of the land, a taking has occurred. Id. The instant case falls within that group.
REVERSED and REMANDED.
COWART and DIAMANTIS, JJ., concur.
NOTES
[1] Ronald Vatalaro and Sharon Ross were substituted as parties appellant following the death of their mother, Billie Vatalaro.
[2] This case illustrates the problems encountered by citizens who must deal with multiple agencies with overlapping jurisdictions and frequently conflicting requirements. This problem could be alleviated by consolidating the permitting process into a single agency. However, that is a matter to be addressed by the legislature.
[3] Effective October 1, 1984, the Warren S. Henderson Wetlands Protection Act of 1984, sections 403.91-.929, Florida Statutes, was enacted to provide heightened protection to certain wetlands.
[4] This case solely involves a claim for inverse condemnation. Vatalaro agreed that DER has wetlands jurisdiction over the subject property. She did not file a petition for review of the denial in the district court. Instead, she brought suit in circuit court alleging that as a result of the permit denial she has been unable to put her property to any use and therefore it has been taken without compensation in violation of the United States and Florida Constitutions. By electing to bring a "taking" challenge, "a party forgoes any opportunity to challenge the permit denial as improper and may not challenge the agency action as arbitrary or capricious or as failing to comply with the intent and purposes of the statute." Key Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153, 160 (Fla. 1982).
[5] Barbara Bess, Section Manager of DER's Wetland Resource Permitting Program, stated in deposition that Vatalaro's property was part of the only mature hardwood wetland in excellent condition within a large region of east Orange County and the only relatively undisturbed wetland any size left of Lake Rouse and that any activities on site without mitigation would have to be limited to very passive recreational uses.
[6] "Property" in the constitutional sense refers to the group of rights which the owner has with respect to the property. United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945).
[7] In Penn Central, the owner of Grand Central Terminal, which had been designated a landmark, filed suit charging that application of landmarks preservation law constituted a taking when the preservation commission refused to approve plans for construction of a 50-story office building over the terminal. The Supreme Court rejected as "quite simply untenable" the contention that property owners may establish a taking "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." Penn Central, 438 U.S. at 130, 98 S.Ct. at 2662. In this case, DER relies on the quoted language to argue that frustration of an owner's intentions to develop his land cannot constitute a taking. However, a complete reading of Penn Central demonstrates otherwise. After the Court made the above-quoted statement, it continued:

"Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole. .. .
Id. 438 U.S. at 130-31, 98 S.Ct. at 2662.