617 So.2d 1071 (1993)
DEPARTMENT OF TRANSPORTATION, Appellant,
v.
Joseph WEISENFELD, Trustee, Appellee.
No. 91-2234.
District Court of Appeal of Florida, Fifth District.
March 26, 1993.
Rehearing Denied May 17, 1993.
Thornton J. Williams, General Counsel and Thomas F. Capshew, Asst. Gen. Counsel, Tallahassee, for appellant.
Gordon H. Harris and G. Robertson Dilg of Gray, Harris & Robinson, P.A., Orlando, for appellee.
EN BANC
COBB, Judge.
The plaintiff below, Weisenfeld, alleged that the filing of a map of reservation by the Department of Transportation (DOT) constituted a temporary regulatory taking of his property entitling him to compensation. DOT denied the allegations, and raised various affirmative defenses.
Weisenfeld moved for a partial summary judgment on liability on the basis that DOT "must be liable as a matter of law for having temporarily inversely condemned Plaintiff's property." The trial court granted the motion, conditioned upon proof of ownership of the property in question. *1072 In other words, the trial court held that, assuming the ownership of the property by Weisenfeld, there was, ipso facto, liability on the part of DOT for having merely filed the map. The trial court unequivocally found that Weisenfeld had been injured and must be compensated. The language of the trial court's order reads:
10. Having taken the Plaintiff's property from September 29, 1988 to June 1, 1990, DEPARTMENT OF TRANSPORTATION must now be required to compensate the Plaintiff for the value of that taking, plus damages caused by the taking and reasonable costs, including attorneys' and appraisers' fees incurred by Plaintiff in the instant action.
This summary adjudication by the trial court that compensation is due the plaintiff was not based upon a scintilla of proof in regard to damages supporting the motion  no depositions, no affidavits, no interrogatories, no sworn pleadings. Indeed, the only affidavit before the court was filed by the state to rebut any possible claim of ownership to a portion of land covered by the reservation map. See Allen v. Orlando Regional Medical Center, 606 So.2d 665 (Fla. 5th DCA 1992).
We reverse the instant summary judgment based upon our reading of First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) and Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622 (Fla. 1990).
In Joint Ventures the Florida Supreme Court affirmatively answered the certified question whether subsections 337.241(2) and (3), Florida Statutes (1987)[1] unconstitutionally provided for an impermissible taking of private property without just compensation. It held that the statute in question was not an appropriate regulation under the police power but was "merely an attempt to circumvent the constitutional and statutory protections afforded private property ownership under the principles of eminent domain." Joint Ventures at 625. The court stated:
Generally, the state must pay property owners under two circumstances. First, the state must pay when it confiscates private property for common use under its power of eminent domain. Second, the state must pay when it regulates private property under its police power in such a manner that the regulation effectively deprives the owner of the economically viable use of that property,[6] thereby unfairly imposing the burden of providing for the public welfare upon the affected owner.[7]
* * * * * *
Although regulation under the police power will always interfere to some degree with property use, compensation must be paid only when that interference *1073 deprives the owner of substantial economic use of his or her property. In effect, this deprivation has been deemed a "taking." Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978). Thus, when compensation is claimed due to governmental regulation of property, the appropriate inquiry is directed to the extent of the interference or deprivation of economic use.
[6] Palm Beach County v. Tessler, 538 So.2d 846, 849 (Fla. 1989) ("There is a right to be compensated through inverse condemnation when governmental action causes a substantial loss of access to one's property even though there is no physical appropriation of the property itself.") (emphasis supplied); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 485, 107 S.Ct. 1232, 1238, 94 L.Ed.2d 472 (1987); Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). See also J. Sackman, Nichol's The Law of Eminent Domain § 6.09, at 6-55 (rev. 3rd ed. 1985) ("The modern prevailing view is that any substantial interference with private property which destroys or lessens its value ... is, in fact and in law, a `taking' in a constitutional sense." (Emphasis supplied.)).
[7] The fifth amendment protection exists to prevent government "`from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Nollan v. California Coastal Comm'n, 483 U.S. 825, 835 n. 4, 107 S.Ct. 3141, 3147 n. 4, 97 L.Ed.2d 677 (1987) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).
It must be emphasized that Joint Ventures did not deal with a claim for compensation, but only with a constitutional challenge to the statutory mechanism. The mere "attempt" embodied in the mechanism to improperly acquire land in the guise of police regulation, thereby circumventing the procedural and substantive safeguards of Chapters 73 and 74, does not automatically equate with a compensible taking. Therefore, Joint Ventures does not support the conclusion, as contended by Weisenfeld, that the mere filing of a reservation map by DOT creates a cause of action on his part.[2]
In First English, it was held that the Fifth Amendment to the United States Constitution requires governmental compensation as a remedy for temporary regulatory takings subsequently invalidated. Such compensation is due "where the government's activities have already worked a taking of all use of the property." First English, 482 U.S. at 322, 107 S.Ct. at 2389. The United States Supreme Court recently reaffirmed this standard. See Lucas v. South Carolina Coastal Council, ___ U.S. ___, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
Our inquiry, then, must be directed to the extent of the interference or deprivation of Weisenfeld's economic use of his property. Joint Ventures at 625. Only if that interference deprived him of all or substantial economic use of his property would he be entitled to compensation. Moreover, the owner's affected property interest must be viewed as a whole. Keystone Bituminous Coal Association v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987); Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The record before us reveals that no evidence whatsoever was adduced before the trial court to sustain a factual determination that Weisenfeld suffered such a substantial deprivation of the use of his property.
The result reached by the trial court is consistent with our recent opinion in Orlando/Orange County Expressway Authority v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA), rev. denied, 591 So.2d 183 (Fla. 1991). For the reasons heretofore set forth in this opinion, *1074 and for those elucidated by the scholarly dissent of Judge Altenbernd in Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corporation, 608 So.2d 52 (Fla. 2d DCA 1992), we recede from Agrigrowth, which was an unfortunate opinion in several respects. For example, it asserts that a regulation effects a taking if it does not substantially advance a legitimate state interest. It cites, as support for this remarkably broad generalization, the case of Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). The language in Agins giving rise to this assertion in Agrigrowth related to the application of a general zoning law to particular property. In Agins, the United States Supreme Court determined that there was no taking and no entitlement to damages resulting from an ordinance placing the owner's land in a residential planned development and open space zone, thereby reducing the number of residences that could be constructed on the property.
Moreover, Agrigrowth seems to equate the Florida Supreme Court's finding of unconstitutionality in respect to subsections 337.241(2) and (3), Florida Statutes (1987) with a taking of property if a reservation map is filed, irrespective of any further allegation or showing of damage to the owner. Joint Ventures simply does not say that.
We reverse the summary judgment entered below and certify conflict with Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corporation, 608 So.2d 52 (Fla. 2d DCA 1992).
REVERSED AND REMANDED for further proceedings consistent with this opinion.
DAUKSCH and W. SHARP, JJ., concur.
HARRIS, J., concurs and concurs specially, with opinion.
GRIFFIN, J., concurs and concurs specially, with opinion.
GOSHORN, C.J., PETERSON and DIAMANTIS, JJ., dissent, with opinion.
HARRIS, Judge, concurring specially.
I concur, but for different reasons, with Judge Cobb's opinion that the summary judgment in this matter must be reversed. I write because the issue relating to the effectiveness of an invalid statute has not been covered.[1]
The dissent starts from the perspective that the recording of the map was a "taking" and has caused at least nominal damages to the landowner, thereby entitling the landowner to a remedy. It latches onto Joint Ventures as a basis for finding that inverse condemnation is that remedy.[2]
I start by examining what the State did, the legal and practical effect of the State action, the effect that such action may have had on the landowner, and the remedy, if any, that might be appropriate. Neither I nor the other members of the majority assume that damages, even nominal, occurred. And I, just as fervently as the dissent, grab onto Joint Ventures  but for the proposition that inverse condemnation may not be the remedy even if the landowner is entitled to relief.

*1075 THE STATE ACTION
What the State did was to record a map pursuant to a state statute which had the intended purpose of controlling future development of affected property for a substantial period of time.

THE LEGAL EFFECT OF THE ACTION
The statute, and therefore the map, had no legal effect. The statute was held unconstitutional because it was beyond the authority of the legislature to enact. Its legal effect is as though it never existed.[3] As a matter of law, the statute and the map could not prevent development of any of the affected property. If this proposition is accepted, then it must be agreed that the only basis for a judgment against the State is either to punish the State for its audacity in attempting this process or else to compensate the landowner for actual (not presumed) damages suffered because of the State's effort.

THE PRACTICAL EFFECT OF THE MAP
I agree that although the map had no legal effect, it might well have had a practical effect. For example, an owner desiring to develop might have been refused a permit by an official relying on the presumed validity of the statute. This would be similar to the First English and Lucas situations except that in both those cases the offending ordinance or statute was a legal act that went too far. No court has yet determined that the attempted enforcement of an invalid act can constitute a "taking" justifying inverse condemnation as opposed to some other cause of action. It may be that the zoning official's refusal to grant a permit based on the presumed validity of the invalid act is sufficient official action to cause a taking. I suggest, however, that even in this case the more appropriate remedy would be slander of title.
A prospective buyer (if the property was on the market) might have withdrawn from negotiations because of the presumed validity of the statute. While there would appear to be damages in this situation, there is no governmental action on which to base a taking. The enactment of a void statute is not governmental action and no affirmative attempt to enforce the void statute is present. Slander of title again would appear to be the remedy.
Even more remote, an owner desiring development or sale of his property might have delayed a development application (as alleged in this case) or the listing of the property for sale in reliance on the presumed validity of the statute. Again, no official action. In the case of development, the owner should be required at least to allege and prove that his intent to develop *1076 preceded the holding by the supreme court that the statute was unconstitutional. Inverse condemnation based on afterthought should not be permitted. And in the case of a delayed listing, to presume damages is to presume a ready, willing and able buyer. Even if a remedy exists, damages are extremely speculative.
Finally, a prospective buyer or developer interested in the owner's property, which is not listed, might have failed to contact the owner to see if the property would be available for sale because of the presumed validity of the statute. Again, no official action, no exhaustion of remedies and the damages are even more speculative. Here we must assume that not only would there be an offer, but an offer acceptable to the owner.

THE EFFECT ON THE LANDOWNER
How does Weisenfeld claim his property interest was affected? He alleges that:
By filing the Map of Reservation, the DOT totally prevented plaintiffs from developing [the property] [because] ...
Pursuant to § 337.241(2)(b), Florida Statutes, plaintiffs were prohibited during the time the Map of Reservation remained in effect from obtaining a development permit ...
Before the statute was held unconstitutional, the owner did nothing formally to move ahead with the development of his property. He filed for no permit; he did not seek a court determination as to the validity of the act. He doesn't even allege that he would have applied for a building permit but for the map. He only alleges that he was prevented from marketing and developing the property as a unit. But if he delayed development because of the bad marketing conditions of 1988 or adverse interest rates or other financing difficulties, then the filing of the map caused no damages  not even nominal. The owner exhausted no administrative remedy and he even failed to prove, by affidavit at the hearing on summary judgment, that the recording of the map caused any delay whatsoever.
And even if the owner suffered compensable injury, I urge the remedy is slander of title (the State's claiming an interest in or control over his land that it does not have)[4] rather than inverse condemnation (a judicially recognized "taking" without any governmental action and in excess of the State's authority).

ANALYSIS OF JOINT VENTURES
Weisenfeld contends that the fact that the Florida Supreme Court held section 337.241 unconstitutional, as a matter of law, establishes that his property was "taken."
It is true that section 337.241, which was enacted to limit development and thus hold down property value while the State decided whether to condemn, was held unconstitutional by the supreme court in Joint Ventures as a "thinly veiled attempt to acquire land by avoiding" condemnation and thus was an unconstitutional exercise of the police power.
The court refused to accept DOT's position that economic reasons (keeping the land affordable) justified such use of the police power:
It would be an unwarranted extension of Fortune Federal, [532 So.2d 1267 (Fla. 1988)] to conclude that the state may deliberately restrict land use under its police power before the commencement of condemnation proceedings without the duty of compensation. The state may not use its police power in such a manner.
Joint Ventures at 626.
It is apparent, therefore, that section 337.241 was held unconstitutional because the state lacked the authority to enact such a provision under the police power.
The police power authorizes the regulation of property for the purpose of "public safety, health, morals, comfort and general well being." Joint Ventures at 625. The state's effort to give itself a competitive advantage if it later decided to acquire the property does not fit any recognized justification *1077 for the exercise of the police power.[5] This distinction is important when we consider the landowner's remedy.
Although Weisenfeld has shown no effort to develop the affected property between the time that the map was recorded and the statute was held unconstitutional, after the ruling on the constitutionality of the statute, he now seeks compensation under the theory of inverse condemnation for the temporary taking that he alleges previously occurred. The trial court found, and the dissent finds, that a taking did occur.
Weisenfeld urges that Joint Ventures requires the payment of compensation to everyone affected by a map recorded pursuant to the unconstitutional statute. He urges that the recording of the map, taking into account the provisions of the unconstitutional statute, constitutes a taking of his right to develop his property. Not so. If the statute had been held constitutional, then his rights would have been affected by the statute and compensation might have been appropriate. But an unconstitutional statute is a void statute and, more importantly, void ab initio. See, e.g., Bhoola v. City of St. Augustine Beach, 588 So.2d 666 (Fla. 5th DCA 1991). Therefore, neither the statute nor the map recorded pursuant thereto could have any legal effect on Weisenfeld's rights merely because they appeared in the statute books or in the public records of the county. Only an improper application of the invalid statute to an asserted right could cause damage. Just as an unobserved falling tree makes no sound, the passive existence of an unconstitutional statute constitutes no taking of any rights.
The position taken by the dissent suggests that once Joint Ventures was successful in having the statute declared unconstitutional as being beyond the powers of the legislature to enact, it could, on remand, claim inverse condemnation for damages incurred because of the "taking" which resulted before the decision on unconstitutionality.
This seems contrary to the rationale of Key Haven Assoc. Enters. v. Bd. of Trustees of Internal Improvement Trust Fund, 427 So.2d 153 (Fla. 1982) which, although considered in another context, nevertheless seems to limit inverse condemnation to those situations in which "the party is willing to accept all actions by the executive branch as correct both as to the constitutionality of the statute implemented and as to the propriety of the agency proceedings." Although Key Haven dealt with the issue as to when one could seek inverse condemnation under an application of the exhaustion of remedies argument, I submit the reasoning is equally applicable to an election of remedies situation.
Should one be permitted to urge that a statute is ineffective because it is beyond the legislative power to enact, prevail on that argument, and then urge that the statute had sufficient validity to cause at least a temporary taking?
I concede I have found no case directly answering this question. It appears, however, that Atlantic Int'l. Inv. Corp. v. State, 478 So.2d 805 (Fla. 1985) suggests the answer: [quoting from its earlier opinion in Key Haven]
Whether a party agrees to the propriety of the action or it is judicially determined is irrelevant. In either case the matter is *1078 closed and a claim of inverse condemnation comes into being. We emphasized that once a party agrees to the propriety of the action and chooses the circuit court forum, it is estopped from any further denial that the action itself was proper.
I submit that the language must be read to mean that the party must agree to the propriety of the action or the court must determine that the governmental action was appropriate before inverse condemnation based on regulatory taking is available. If the court determines the act was constitutionally invalid (not merely invalid as constituting a taking without compensation), the plaintiff has prevailed and has elected his remedy.
In Joint Ventures, the court held:
Thus when compensation is claimed due to governmental regulation of property, the appropriate inquiry is directed to the extent of the interference or deprivation of economic use. [Emphasis added.]
Joint Ventures at 625. This obviously refers to the existence of a valid governmental regulation that does interfere with, or deprive of, intended economic use. Certainly valid regulations that go "too far" can constitute a "taking." This is not such a case.
Although the application of an invalid statute to an asserted right of an owner will justify an action for damages, a void statute (including the filing of a map under such statute) cannot constitute a taking merely by its presence within the statute books. The provisions of an unconstitutional statute are not self-executing.
Joint Ventures, instead of creating a gold mine of inverse condemnation cases in favor of anyone fortuitous enough to have even a fraction of their property located within the affected area, has instead prevented such cases by holding the statute unconstitutional and therefore void and ineffective as to the property rights of anyone. This is what distinguishes this case from First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). In order to justify an action, therefore, the owner must allege and prove that the invalid statute was improperly asserted against his claimed property right  such as a denial of a permit.
In First English, the court held:
These cases reflect the fact that "temporary" takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation... . Invalidation of the ordinance or its successor ordinance after this period of time, though converting the taking into a "temporary" one, is not a sufficient remedy to meet the demands of the Just Compensation Clause. [Emphasis added.]
First English, 482 U.S. at 318-19, 107 S.Ct. at 2387-88.
It is important to recognize the context in which the court in First English uses the term "invalidate." The court is addressing (and reversing) the rule in California that a landowner is not entitled to compensation "until the challenged regulation or ordinance has been held excessive in an action for declaratory relief or a writ of mandamus and the government has nevertheless decided to continue the regulation in effect." First English, 482 U.S. at 308, 107 S.Ct. at 2382.
The reason for such a rule was that the California court believed that once a valid regulation or ordinance was deemed to have gone "too far," and thus would require that compensation be paid to the landowner, the legislative body could decide to amend or rescind the objectionable legislation or could elect to continue the regulation and pay the compensation. But the decision should be the legislature's and not the property owner's. The court in First English agreed that the legislature should be the one to decide whether the taking, once established, should be permanent or temporary. But that decision does not end the matter.
[W]e have not resolved whether abandonment by the government requires payment of compensation for the period of time during which regulations deny a *1079 landowner all use of his land. [Emphasis added.]
Once a court determines that a taking has occurred, the government retains the whole range of options already available  amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain... . We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective. [Emphasis added.]
First English, 482 U.S. at 321, 107 S.Ct. at 2389.
The First English court was not using the term "invalidate" in the sense that the statute is unconstitutional because it is beyond the authority of the legislature to enact (as in our case), but rather was contemplating a valid regulation that causes an unconstitutional taking of property unless compensation is paid.[6] If the statute is beyond the authority of the legislature to enact, the legislature cannot (nor would it have any reason to) amend or withdraw it; it is void. It was the lawful ordinance that causes an unconstitutional taking which is subject to amendment, withdrawal or ratification upon payment of compensation that concerned the First English court.
The facts of First English are important. In that case the church's retreat facilities (dining hall, bunk houses, etc.) were destroyed in a flood. The county immediately passed an ordinance preventing the church from rebuilding because of safety concerns and the church immediately asserted its right to compensation because of the "taking." The church claimed that it was being denied "all use" of its property. Until the ordinance was replaced by a less restrictive one,[7] the county  under color of the ordinance  did in fact deny the church all use of the property. The First English court held that the county's enforcement of the more restrictive ordinance (admittedly valid during the term of its enforcement) which denied all use of the owner's property constituted a "temporary taking." But in First English there is no doubt that the ordinance was a proper exercise of the police power. It was a valid ordinance.
In our case the statute was beyond the authority of the legislature to enact under the police power and was void. Standing alone, it could not constitute a taking. There are no allegations that the invalid statute was improperly asserted against any rights of Weisenfeld[8] and therefore *1080 summary judgment should be entered in favor of DOT.[9]
GRIFFIN, Judge, concurring specially.
I agree that the decision in Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622 (Fla. 1990), does not support the approach earlier taken by this court in Orlando/Orange County Expressway Authority v. W & F Agri-growth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA), rev. denied, 591 So.2d 183 (Fla. 1991). DOT correctly contends that a regulatory enactment declared unconstitutional as an invalid exercise of police power does not necessarily mean a "taking" of the regulated property has occurred. A traditional "takings" analysis must still be applied to each affected parcel.
The relationship between the invalidity of land-use regulation that interferes with property rights in violation of due process and land use regulation that effects a "taking" is not easily understood:
[T]he nature of the difficulty plaguing Court decisions on this issue is substantial and fundamental: It stems from a continuous failure to articulate a consistent view of the relationship between "deprivations" and "takings" when considering attacks on the constitutionality of state and local regulations restricting private property rights.
Michael J. Davis & Robert L. Glicksman, To the Promised Land: A Century of Wandering and a Final Homeland for the Due Process and Taking Clauses, 68 Or.L.Rev. 393, 394 (1989). The fifth amendment contains two discrete protections: "No person shall ... be deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The first of these is commonly called the "police power;" the second is the power of eminent domain. Patrick Wiseman, When the End Justifies the Means: Understanding Takings Jurisprudence In a Legal System With Integrity, 63 St. John's L.Rev. 433, 437 (1988). One of the problems in the area of regulatory takings law is that:
[C]ourts frequently fail to make the distinction between two ways in which government may abuse its power: first, government may act arbitrarily, in violation of due process; second, government may so intrusively regulate the use of property in pursuit of legitimate police power objectives as to take the property without compensation, in violation of the just compensation clause. In the first case, the government action is simply invalid; in the second case, the government action is invalid absent compensation, and so government may either abandon its regulation or validate its action by payment of appropriate compensation, i.e., by exercising its power of eminent domain. The failure to distinguish between these two abuses of government power contributed to the confusion and apparent incoherence of taking law.
Wiseman, supra, at 438. Eide v. Sarasota County, 908 F.2d 716 (11th Cir.1990), cert. denied, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991) (dividing theories into three: just compensation, due process takings and arbitrary and capricious due process).
Uncertainty in this area may stem from the way the word "invalid" is used in the cases. Apparently, a land use regulation can be either "invalid" (unconstitutional) because it violates the requirements of due process or "invalid" because the regulation "goes so far" that it becomes a taking requiring compensation. See PruneYard Shopping Center v. Robins, 447 U.S. 74, 80-81, 100 S.Ct. 2035, 2040-41, 64 L.Ed.2d 741 (1980); Lucas v. South Carolina Coastal Council, ___ U.S. ___, ___ n. 8, 112 S.Ct. 2886, 2895 n. 8, 120 L.Ed.2d 798, 815 n. 8 (1992). A land use regulation that *1081 is invalidated because it violates due process requirements can give rise to a damage remedy. It is not a "taking requiring compensation."[1] Wiseman, supra, 463-464.[2] A land use regulation referred to as "invalid" by the United States Supreme Court because it interferes with property rights without compensation is not usually struck down as unconstitutional; it is either withdrawn by the government or continued in force with payment of compensation.[3] A statute is usually struck down only if it violates due process, a rare phenomenon.[4]
If a land use regulation can be declared unconstitutional without being a "taking,"[5] it becomes essential to determine the basis on which our supreme court invalidated sections 337.241(2), (3) in Joint Ventures. If the statute were declared "invalid" because its interference with private property rights was so extreme that the land owner was deprived of "all use," it might be a "taking" for which "temporary taking" compensation would be payable. On the other hand, if the statute were held unconstitutional because it offended the other requirement of the fifth amendment that a citizen not be "deprived" of his property without "due process of law", then no inverse condemnation compensation is payable, only actual damages are recoverable.
There is admittedly some language in the Joint Ventures opinion that appears to reference a takings analysis. As discussed above, however, the very fact that the statute was held unconstitutional indicates the statute was deemed to violate the fifth amendment due process guarantee. Furthermore, in the main, the Joint Ventures opinion focuses squarely on the question whether the statutory scheme provides a proper means to a valid end  a classic due process inquiry:
We do not question the reasonableness of the state's goal to facilitate the general welfare. Rather we are concerned here with the means by which the legislature attempts to achieve that goal.
563 So.2d at 626. The Joint Ventures court expressly observed that:
Although regulation under the police power will always interfere to some degree with property use, compensation must be paid only when that interference deprives the owner of substantial economic use of his or her property. In effect, this deprivation has been deemed a "taking." Thus when compensation is claimed due to governmental regulation of property, the appropriate inquiry is directed to the extent of the interference or deprivation of economic use.

Here, however, we do not deal with a claim for compensation, but with a constitutional challenge to the statutory mechanism. Our inquiry requires that we determine whether the statute *1082 is an appropriate regulation under the police power, as DOT asserts, or whether the statute is merely an attempt to circumvent the constitutional and statutory protections afforded private property ownership under the principles of eminent domain.
Id. at 625 (citations omitted) (emphasis added). This certainly must be the reason why the Joint Ventures majority did not respond to the dissent's argument that the challenged statute may or may not operate as a "taking," depending on the circumstances of each affected parcel. The extent of interference or deprivation (i.e., whether there was a "taking") was simply irrelevant to the court's decision to declare the statute unconstitutional. The statute was held invalid because it did not meet the requirements of due process, not because it always resulted in a "taking." In Joint Ventures the court eschewed any factual analysis that would support a "taking" claim and invalidated the statute on due process grounds.
If Weisenfeld can show that he was actually damaged by the violation of his due process rights when the state imposed a map of reservation on his property, he should recover those damages. There is no basis to conclude on this record, however, much less from Joint Ventures, that this plaintiff ever suffered a temporary "taking" of his property. If not barred by other defects in his claim, he might recast his cause of action to seek redress for the violation of his due process rights, or attempt to show that, when the state imposed the map of reservation on his land, he suffered a denial of all economically viable use of the land[6]  a compensable "taking."[7]
There is also a procedural element to these post-Joint Ventures "takings" claims that may preclude summary judgment. The United States Supreme Court has consistently held, reinforced by both First English and Lucas, that in order for an aggrieved landowner to assert a claim that a given land use regulation has worked a "taking" of his property, he must show that he has availed himself of the relief provisions afforded by that same statute. "A court cannot determine whether a regulation has gone too far unless it knows how far the regulation goes." MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285, reh. denied, 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986). As explained by the Supreme Court in Williamson County, 473 U.S. at 187-195, 105 S.Ct. at 3117-3121, the procedural steps available to a property owner to be relieved of the allegedly confiscatory effects of land use regulation must be tried before a "taking" can be asserted.[8] This is a sensible limitation which would avoid exactly what is occurring in the many cases filed after Joint Ventures where landowners who *1083 were unaware of the map of reservation, who had no intention of developing their land, no ability to develop their land, or who never took any steps to develop their land have filed inverse condemnation suits to recover compensation (and attorney's fees) for a "temporary taking" of their property rights based solely on the operation of the limiting part of the statute, ignoring the relief-giving part of the statute. Unlike the plaintiff in Joint Ventures, in the present case, it appears that Weisenfeld never sought to obtain a variance that would allow issuance of a permit.[9] If, on remand, it appears that these facts are true, the inverse condemnation claim should be entirely barred.[10]
PER CURIAM, dissenting.
The trial court's ruling on a motion for summary judgment that as a matter of law, constitutionally, a temporary taking of Weisenfeld's property occurred when the appellant, Department of Transportation (DOT), recorded in the public records a map of reservation pursuant to sections 337.241(2) and (3), Florida Statutes (1987), should be affirmed where the map of reservation filed had the effect of prohibiting development on a portion of Weisenfeld's property until DOT recorded a withdrawal of the map.

The Case Law
This district has previously addressed the issue of whether the filing of a map of reservation results in a temporary taking. In Orlando/Orange County Expressway Authority v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA), review denied, 591 So.2d 183 (Fla. 1991), a three member panel of this court held that the recording of a map of reservation constituted a temporary taking of private property without compensation in contravention of the Fifth Amendment of the United States Constitution and Article X, Section 6(a) of the Florida Constitution. In W & F Agrigrowth, the Authority filed and recorded a map of reservation pursuant to section 337.241(1), Florida Statutes (1987). The landowner alleged that the recordation of the map resulted in a denial of his right to construct or develop anything on the property for as long as ten years and that the filing of the map constituted a taking of his property without just compensation. The landowner further alleged that as a result of the filing of the map, he was damaged by the loss of a contract to sell his property. The trial court granted the motion for summary judgment. The trial court found that a temporary taking had occurred and indicated that a jury trial would be held on the question of damages.
On appeal by the Authority, the W & F Agrigrowth panel held:
We hold that when a governmental entity, by use of a recorded reservation map, attempts to "land bank" private property in a thinly veiled attempt to acquire such property by avoiding constitutionally and legislatively mandated procedural and substantive protections, and in the process freezes property and depresses land values in anticipation of eminent domain proceedings, such action constitutes a taking of property and an inverse condemnation action will lie. Joint Ventures; Hernando County v. Budget Inns of Florida, Inc., 555 So.2d 1319 (Fla. 5th DCA 1990). See also First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 *1084 (1987); Agins v. City of Tiburon, supra. The recording of a reservation map does not advance a legitimate state interest; it only advances an improper government purpose of taking private property without paying just and full compensation which violates clear constitutional mandates.
W & F Agrigrowth, 582 So.2d at 792. Four other panels of this court have followed W & F Agrigrowth: Seminole County Expressway Auth. v. Bullet, 595 So.2d 105 (Fla. 5th DCA 1992); Orlando/Orange County Expressway Auth. v. West 50 Ltd., 591 So.2d 682 (Fla. 5th DCA 1992); Orlando/Orange County Expressway Auth. v. West Orange Nurseries, 590 So.2d 1129 (Fla. 5th DCA 1992); and Orlando/Orange County Expressway Auth. v. Orange North Assocs., 590 So.2d 1099 (Fla. 5th DCA 1991). See also Palm Beach County v. Wright, 612 So.2d 709 (Fla. 4th DCA 1993) and Tampa-Hillsborough Expressway Auth. v. A.G.W.S. Corp., 608 So.2d 52 (Fla. 2d DCA 1992). As previously noted, the Florida Supreme Court denied review of W & F Agrigrowth at 591 So.2d 183 (Fla. 1991).
In Joint Ventures, Inc. v. Department of Transp., 563 So.2d 622 (Fla. 1990), decided during the pendency of the appeal in W & F Agrigrowth and relied on therein, the Florida Supreme Court considered the effect of subsections 337.241(2) and (3), Florida Statutes (1987). The court addressed a question certified by the district court of appeal and stated the following:
We have for review Joint Ventures, Inc. v. Department of Transportation, 519 So.2d 1069 (Fla. 1st DCA 1988), in which the district court asked in a certified question whether subsections 337.241(2) and (3), Florida Statutes (1987), unconstitutionally permit the state to take private property without just compensation.[1] We answer the question in the affirmative, finding those subsections invalid as a violation of the fifth amendment to the United States Constitution and article X, section 6(a) of the Florida Constitution.
[1] The question which the district court certified to be of great public importance is:
Whether subsections 337.241(2) and (3) are unconstitutional in that they provide for an impermissible taking of property without just compensation and deny equal protection and due process in failing to provide an adequate remedy.

Joint Ventures, Inc. v. Department of Transp., 519 So.2d 1069, 1072 (Fla. 1st DCA 1988). We have discretionary jurisdiction. Art. V, § 3(b)(4), Fla. Const.
Id. at 623 (emphasis added). By answering the certified question in this fashion, the court clearly held that the filing of the map of reservation was a taking of private property, albeit a temporary taking.[1] The holding of the court is further emphasized by Justice Ehrlich's dissenting opinion, which attempted to argue:
Although in most circumstances imposition of a map of reservation on vacant land will deprive the owner of substantially all beneficial use of the property, it cannot be said that every conceivable application of this statute will effect a taking.
Joint Ventures, 563 So.2d at 628 (Ehrlich, C.J., dissenting) (emphasis in original). However, a majority of the court failed to *1085 agree with this argument and decided otherwise.[2]
Turning now to the instant case, Weisenfeld sought damages on the theory of inverse condemnation, just as this court suggested was appropriate in W & F Agrigrowth. In his complaint, Weisenfeld alleged the following:
1. Weisenfeld had purchased his property specifically to develop it pursuant to a master concept plan;
2. By the time the Department of Transportation had filed the map of reservation, construction was either completed, underway, or planned on all of the property;
3. The map of reservation made further construction impossible; and
4. If the development of the property had been permitted to proceed as scheduled, then the use of all property, construction, and marketing could have been conducted as a part of the overall plan designed to minimize costs and maximize returns.
Upon finding that a temporary taking had occurred, the trial court entered a partial summary judgment against DOT solely on the issue of liability for the temporary taking based on the clear and well-reasoned opinions in Joint Ventures and W & F Agrigrowth.
It has been urged that Joint Ventures is somehow distinguishable from the instant case. This contention is based on language in Justice Barkett's opinion observing that the Joint Ventures court did not have before it a claim for compensation. Joint Ventures, 563 So.2d at 625. However, this argument ignores the fact that neither the issue on appeal in the instant case nor in any of this court's four previous opinions following W & F Agrigrowth involved a claim for compensation. Instead, just as in Joint Ventures, the property owner here asserted that the filing and recording of the map of reservation constituted a taking. Whether the allegations in the complaint relating to damages or compensation are susceptible of proof is a separate issue that has not been addressed by the trial court, and consequently, is not before this court on appeal.

The Theoretical Basis
The main question presented is whether a citizen has redress and a remedy against the government for governmental action which is unconstitutional and whether the legislative branch may authorize such unconstitutional action and limit the citizen's remedy. The scope of this question is narrowed in this case to whether the filing and recording of a "map of reservation" by the Department of Transportation (DOT) constitutes a "taking" of a property interest in the land described in the map for which compensation should be paid the landowner under the "taking" clauses of the State and Federal constitutions.
Part of the difference of judicial opinion as to the correct answer to this question, as presented in this particular case, appears to have a theoretical basis which is exemplified by the question: "Does a legal cause of action always include an element of `damages'?" The answer to this question should be "no", although many believe otherwise. There are distinct theoretical differences between a cause of action and damages. A cause of action is the statement of a claim for which the law provides a remedy. Further, the law provides a remedy for a violation of all legal rights. Damages are only incidental to a cause of action and are to provide recompense for *1086 loss, if any, that results from the breach of a legal right.
Confusion results from the fact that the one best known legal cause of action is for the tort of negligence, and that cause of action peculiarly does incorporate by definition an element of damages as an element of the cause of action. This is true because it relates to an unintended act and in creating that cause of action wisdom dictated that it was not in the public interest to provide a legal remedy when the consequence of the unintended act, such as an unintended jostling or bumping in a crowded elevator, although technically the violation of the right not to have an offensive or harmful personal bodily contact, nevertheless, was trivial in that no genuine harm occurred. However, for all intentional torts to persons or property, (such as assault, battery and trespass) damages are presumed to flow from the intentional violation of a legal right and therefore damages, while not a part of the cause of action itself, are a given adjunct. This distinction explains the existence of the legal concept of "nominal damages" and the failure to make this distinction causes some to argue that every cause of action requires an element of damages.[3] Whenever the intentional invasion of a legal right occurs the law infers some damage to the party whose rights were violated and if no evidence is adduced as to any particular specific loss or damage, the law "rights" or remedies the wrong by awarding nominal damages, usually in the amount of $1.00.
The constitutional right to own private property includes at least three aspects: (1) the right to use the property, (2) the right to improve the property to enhance its value, and (3) the right to transfer or alienate the property. Next only to the right to use and improve it, is the value of the right to sell it and sometimes, when the property no longer has use or investment value to the present owner, to that owner the right to sell it becomes the most valuable right.
As a practical matter in the marketplace, real property cannot be sold unless the owner has a marketable title. A land title is not marketable if it is subject to some cloud, doubt, threat or suspicion, which would deter a reasonable man from buying it. The marketability of title to land is a valuable aspect of the ownership of that land. The law recognizes that legal right and affords the owner a remedy for an intentional violation of that right. It is an intentional tort to slander or disparage the owner's record title to real property by any act which foreseeably impairs the property's vendibility.[4]
The very purpose of section 337.241, Florida Statutes, which the Supreme Court has now held to be unconstitutional,[5] was to freeze the value of the property by encroaching *1087 on the owner's right to improve the property and impairing its marketability by notifying prospective purchasers that the property was under threat of condemnation. The DOT was not required by the statute to file such maps of reservation[6] and DOT knew, or should have known, that such action clouded the owner's title, impaired the marketability of the lands described and violated the property owner's rights.[7] The statute being held unconstitutional does not legitimize the act of clouding the title to private property for an ulterior purpose. The fact that the legislature will pass a statute attempting to authorize the violation of a constitutionally guaranteed property right does not make that violation any less wrong.[8] The filing of the map of reservation in the public records was definitely calculated to, and did, cloud the title to the land described in it and gives constructive and actual notice to prospective lenders and purchasers that the state is threatening to acquire title by eminent domain proceedings and that action takes from the owner valuable aspects of his property.
Whether or not a particular owner suffered any specific damages as a result of such filing and taking is an entirely separate matter. If the recording of the map caused the owner no special damages the owner will be entitled to only nominal damages of $1.00. On the other hand, if the owner suffered special damages as a result of the filing of the map, the owner should receive compensation for the loss of those property rights.
Take a real example. A property owner owns a home within the area described in the map of reservation. The property owner's employer transfers him to a distant location. The property owner needs to sell his home here in order to obtain funds to purchase a home for his family at his new place of employment. Because of the map of reservation the owner cannot sell the home for a fair value because no one wants to buy a home which is under a threat of condemnation. For the same reason financial institutions will not lend purchase money to prospective buyers, nor funds to the owner to make needed repairs. The property owner cannot move his family. The State will not formally file eminent domain proceedings and compensate him and yet it has effectively prevented the sale of the property to anyone else for a fair value. The owner and family suffers substantial damages. This condition can continue for months and years and until either the State formally files eminent domain proceedings and pays the owner[9] or a court grants the *1088 owner some remedy for the wrong. Except in the minds of those who believe that benefit to the public ("society") is more important than, and justifies encroachment on, individual rights State action intentionally clouding the title to property in order to control or reduce its market value and to thereby "benefit" the public at the expense of the individual is not justified, and is legally and morally wrong. All such action should be soundly condemned and individual citizens who have suffered injury as the result of this unfortunate governmental policy and action should be compensated for their damages, if any.

Windfall Attorney's Fees
In the recent United States Supreme Court opinion, Farrar v. Hobby, ___ U.S. ___, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Court ruled that although petitioners who recovered only $1.00 in nominal damages against one defendant in a civil rights action were "prevailing parties" as to that defendant under The Civil Rights Attorney's Fees Award Act of 1976, 90 Stat. 2641, as amended, 42 U.S.C. § 1988, under the circumstances of the case a "reasonable fee" was no fee. In affirming the Court of Appeal's decision which reversed the fee award, the United States Supreme Court states:
Although the "technical" nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded under § 1988. Once civil rights litigation materially alters the legal relationship between the parties, "the degree of the plaintiff's overall success goes to the reasonableness" of a fee award under Hensley v. Eckerhart, 461 U.S. 424, [103 S.Ct. 1933, 76 L.Ed.2d 40] (1983). [Texas State Teachers Assn. v. Garland Independent School District, 489 U.S. 782, 793 [109 S.Ct. 1486, 1494, 103 L.Ed.2d 866] (1989)]. Indeed, "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained." Hensley, supra, [461 U.S.] at 436 [103 S.Ct. at 1941]. Accord, Marek v. Chesney, 473 U.S. 1, 11 [105 S.Ct. 3012, 3017-18, 87 L.Ed.2d 1] (1985). In this case, petitioners received nominal damages instead of the $17 million in compensatory damages that they sought. This litigation accomplished little beyond giving petitioners "the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated" in some unspecified way. Hewitt, [v. Helms] supra, [482 U.S. 755] at 762 [107 S.Ct. 2672, at 2676-77, 96 L.Ed.2d 654]. We have already observed that if "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."
* * * * * *
Having considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness, see Hensley, 461 U.S., at 430, n. 3, [103 S.Ct., at 1937, n. 3] or multiplying "the number of hours reasonably expended ... by a reasonable hourly rate." id., at 433, 103 S.Ct., at 1939.
* * * * * *
When a failure to prove an essential element of his claim for monetary relief, see Carey [v. Piphus], supra, [435 U.S. 247] at 256-257, 264 [98 S.Ct. 1042, at 1048-49, 1052-53, 55 L.Ed.2d 252] the only reasonable fee is usually no fee at all. In an apparent failure to heed our admonition that fee awards under § 1988 were never intended to "`produce windfalls to attorneys,'" Riverside v. Rivera, supra, [477 U.S. 561] at 580 [106 S.Ct. 2686, at 2697, 91 L.Ed.2d 466] (plurality opinion) (quoting S.Rep. No. 94-1011, p. 6 (1976)), the District Court awarded $280,000 in attorney's fees without "consider[ing] the relationship between the extent of *1089 success and the amount of the fee award." Hensley, supra, 461 U.S. at 438, 103 S.Ct. at 1942.
Farrar v. Hobby, ___ U.S. at ___-___, 113 S.Ct. at 575.[10]
This view of the United States Supreme Court involving the propriety of awarding full fees where a party has achieved only nominal or insubstantial success[11] has been followed in Florida. See Malagon v. Solari, 566 So.2d 352 (Fla. 4th DCA 1990); Pappert v. Mobilinium Associates V., 512 So.2d 1096 (Fla. 4th DCA 1987). In Malagon, the fourth district cites to the ruling in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) as follows:
In Pappert v. Mobilinium Associates V., 512 So.2d 1096 (Fla. 4th DCA 1987), this court relied on Hensley in its holding that the extent of success by the prevailing plaintiffs should be utilized by the trial court in determining the amount of fees due those plaintiffs. Quoting Hensley, this court said:
* * * * * *
But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained. [461 U.S. at 440] 103 S.Ct. at 1943.
Malagon, 566 So.2d at 354.
Although in a successful inverse condemnation action the property owner is entitled to attorney's fees,[12] the award of nominal or insubstantial damages in a subsequent trial is controlled by the court and must bear both on the propriety and amount of any fee award. See also § 73.092, Fla. Stat. (1991). Therefore, the spectre of possible windfall attorney's fees in this or any other similar case neither has to be, nor should be, a factor regarding the sole issue before this court of whether the recording of the map of reservation constituted a taking.
The order of the trial court determining that a temporary taking of Weisenfeld's property occurred when the DOT recorded the map of reservation should be affirmed.
GOSHORN, C.J., and PETERSON and DIAMANTIS, JJ., concur.
NOTES
[1] These sections provided:

(2) Upon recording, such map shall establish:
(a) A building setback line from the centerline of any road existing as of the date of such recording; and no development permits, as defined in s. 380.031(4), shall be granted by any governmental entity for new construction of any type or for renovation of an existing commercial structure that exceeds 20 percent of the appraised value of the structure. No restriction shall be placed on the renovation or improvement of existing residential structures, as long as such structures continue to be used as private residences.
(b) An area of proposed road construction within which development permits, as defined in s. 380.031(4), shall not be issued for a period of 5 years from the date of recording such map. The 5-year period may be extended for an additional 5-year period by the same procedure set forth in subsection (1).
(3) Upon petition by an affected property owner alleging that such property regulation is unreasonable or arbitrary and that its effect is to deny a substantial portion of the beneficial use of such property, the department or expressway authority shall hold an administrative hearing in accordance with the provisions of chapter 120. When such a hearing results in an order finding in favor of the petitioning property owner, the department or expressway authority shall have 180 days from the date of such order to acquire such property or file appropriate proceedings. Appellate review by either party may be resorted to, but such review will not affect the 180-day limitation when such appeal is taken by the department or expressway authority unless execution of such order is stayed by the appellate court having jurisdiction.
[2] In Note, Takings  Isn't There a Better Approach to Planned Condemnations?  Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622 (Fla. 1990), Fla.St.U.L.Rev., Vol. 19, # 4, P. 1169 (1992), the writer points out that if Joint Ventures stands for the proposition that all of DOT's reservations effect unconstitutional takings, then the "dimensions of the potential public liability are staggering." This would result from courts awarding attorney's fees and costs to all plaintiffs who had established a taking and the fact that an owner would be free to sue the state for damages, "at the State's expense."
[1] I write from a different perspective, but reach the same result as Judge Altenbernd in Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 608 So.2d 52 (Fla. 2d DCA 1992). He perceives, however, that the statute enacted in violation of due process constitutes a "taking"; I urge it does not.
[2] I submit that nominal damages is not a proper basis for inverse condemnation. "Under Florida law, the owner must have been deprived of all beneficial use of the property in order to be entitled to compensation for inverse condemnation, and the extent of the property's decline in value had to be determined before the taking issue could be resolved ... thus, in the present case, the factual dispute over market value damage precludes a grant of partial summary judgment on whether a taking has occurred. The partial summary judgment is reversed and the case remanded to determine whether there was substantial market value damage to constitute a taking, which would then require the Authority to institute eminent domain proceedings." Sarasota-Manatee Airport Auth. v. Icard, 567 So.2d 937 (Fla. 2d DCA 1990), rev. denied, 576 So.2d 288 (1991). In our case, summary judgment was entered without even a proffer of proof of damages.
[3] This is stated with perhaps more certainty than is justified. I agree completely with Justice Barkett's statement in Martinez v. Scanlan, 582 So.2d 1167, 1176 (Fla. 1991):

When a court declares a statute facially unconstitutional, it means, in plain English, that the enactment has been null and void from the outset. It is a declaration that the legislature acts outside its power when it contravenes constitutional dictates.
Having decided that this legislative enactment is a facially unconstitutional violation of the single-subject rule, the Court has no power to breathe constitutional life into it for the period between its enactment and the Court's declaration of facial invalidity. How can a court require compliance with an act it says the legislature had no authority to enact? Logically, it cannot, judicial fiat notwithstanding.
The confusion I now have is that Justice Barkett's statement was in dissent and the majority did, in fact, breathe constitutional life temporarily into the act. But in doing so, the majority stated through Justice McDonald, (Martinez at 1174):
In determining whether a statute is void ab initio, however, this court seemingly has distinguished between the constitutional authority, or power, for the enactment as opposed to the form of the enactment. McCormick v. Bounetheau, 139 Fla. 461, 190 So. 882 (1939).
McCormick holds:
The enactment is void ab initio if it violates a command or prohibition express or implied of the Constitution, while if deficient because of form as distinguished from power there may be a de facto jurisdiction to protect organic rights created "before the illegality of enactment is adjudged."
McCormick 190 So. at 894.
While it might be said that the legislation's deficiency in Martinez was a matter of form (failure to comply with the single subject rule), certainly the statute in the present case was invalid because of a lack of power to enact.
[4] See, e.g., Gates v. Utsey, 177 So.2d 486 (Fla. 1st DCA 1965).
[5] Further, since the Florida Constitution, Article X, Section 6(a) (unlike the United States Constitution), conditions even the exercise of eminent domain on a valid "public purpose," the deliberate suppression of land value on property that the State may later decide to condemn, does not appear to meet that criteria. The fact, as found by the Joint Ventures majority, that the State lacked the power to enact the statute could not be cured by providing compensation. The Joint Ventures dissent urged that since inverse condemnation provided compensation, the statute was constitutional. But the constitution does not permit the State to increase its power merely by paying for it. If it lacked the power to enact the statute, that power is not provided merely because the State agrees to pay compensation. Suppose the legislature mandated that all residences be painted red and agreed to pay the cost of painting and for diminution in property value. The statute would not be valid under the police power because it does not sufficiently relate to general welfare and would not be valid under the power of eminent domain because it lacks the necessary "public purpose." Compensation would not cure these defects.
[6] It is the taking without compensation that is unconstitutional, not the ordinance which causes the taking. This position is also accepted in the First English dissent:

There is no dispute about the proposition that a regulation which goes "too far" must be deemed a taking... . When that happens, the government has a choice: it may abandon the regulation or it may continue to regulate and compensate those whose property it takes.
First English, 482 U.S. at 328, 107 S.Ct. at 2393. A statute can never go "too far" if it is an invalid enactment.
[7] The ordinance was never held to be beyond the authority of the county to enact. In fact, everyone considered the ordinance effective to do what it was intended to do. It was a classic "police power" ordinance (safety) which went "too far."
[8] Weisenfeld filed no affidavit in support of the summary judgment. Even his complaint fails to assert that he made any effort to obtain a development permit. There is no showing in the record that his failure to develop was not based more on the economic climate than on any perceived regulatory restriction. Justice Kennedy in his special concurring opinion in Lucas v. South Carolina Coastal Council, ___ U.S. ___, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) held:

The facts necessary to the determination [whether a temporary taking had occurred] have not been developed in the record. Among the matters to be considered on remand must be whether petitioner had the intent and capacity to develop the property and failed to do so in the interim period because the State prevented him. Any failure by petitioner to comply with relevant administrative requirements [such as apply for a permit?] will be part of that analysis. at ___, 112 S.Ct. at 2902-03.
Again, in Lucas, there was a concession that the Beachfront Management Act was valid under South Carolina law. The question, therefore, was whether the valid act constituted a "taking."
[9] Since the invalid statute could take none of Weisenfeld's rights, inverse condemnation appears to be the wrong remedy in any event. If the recording of the map prevented financing, for example, it appears slander of title would be the remedy. If a governmental official asserted the invalid statute to the detriment of a landowner, then 42 U.S.C. section 1983 might be the appropriate remedy. See generally the due process argument contained in the First English dissent.
[1] Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).
[2] See also Strong, On Placing Property Due Process Center Stage in Takings Jurisprudence, 49 Ohio St.L.J. 591, 592 (1988).
[3] See, e.g., Presbytery of Seattle v. King County, 114 Wash.2d 320, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990), where the Washington Supreme Court observed:

If a regulation is not aimed at a legitimate public purpose, or uses a means which does not tend to achieve it, or if it unduly oppresses the landowner, then the ordinance will be struck down as violative of due process and the remedy is invalidation of the regulation. No compensation (which properly belongs with a "taking" analysis) is warranted in the face of a due process violation.
Id. 787 P.2d at 913.
[4] "Joint Ventures is noteworthy because the statute was declared unconstitutional on its face." Thomas E. Roberts and Thomas C. Shearer, Report of the Subcommittee on Land-Use Litigation and Damages: Regulation, Property Rights, and Remedies, 23 The Urban Lawyer 785, 794 (1991).
[5] One Supreme Court decision has arguably equated a regulation found to be an invalid exercise of police power with a "taking". Nollan v. California Coastal Com'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). The Nollan majority used a due process analysis to invalidate a requirement that the landowner allow an easement for public access as a condition of issuance of a building permit. Id. at 837, 107 S.Ct. at 3148-49. The Nollan court was careful to note, however, that the interference with property rights involved there fell into a very special category  a permanent physical invasion of the property.
[6] The Joint Ventures court suggests the test in Florida is a "substantial interference." 563 So.2d at 624, n. 6.
[7] DOT also argues that because the record shows that the portion of Weisenfeld's property affected by the map of reservation was minimal (approximately 4%), there is a genuine issue of fact as to whether he was deprived of all (or even "substantial") economic use of his land. Justice Scalia addressed this "segmentation" argument in Lucas, ___ U.S. at ___, 112 S.Ct. at 2894, n. 7, as follows:

Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole... . Unsurprisingly, this uncertainty regarding the composition of the denominator in our "deprivation" fraction has produced inconsistent pronouncements by the Court. The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property  i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value.
(citations omitted). See also Presbytery, 787 P.2d at 914-915.
[8] See §§ 337.241(2)(b),  .241(3), Fla. Stat. (1989).
[9] Weisenfeld alleges the property was acquired in 1983 and 1986. There is no allegation of any development permit application or other effort to seek approval for development prior to the map of reservation filing on September 29, 1988. There is no allegation of any effort to invoke the relief provisions of the statute prior to filing the instant action for inverse condemnation one year later, in September, 1989.
[10] I recognize that such exhaustion is unnecessary as a predicate to making a facial challenge to the constitutionality of a land use statute or regulation. I also acknowledge that the Joint Ventures court did not find the remedial provision adequate to save the legislation. However, Weisenfeld's suit only asserts a claim for inverse condemnation, seeking compensation for a "taking" that occurred until the statute was invalidated. A taking claim requires resort to the relief provisions of the challenged regulation. Eide, 908 F.2d at 723-26.
[1] First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) established that the Fifth Amendment to the United States Constitution requires the government to pay compensation for a temporary taking of a landowner's property as well as for a permanent taking. The Court held

that invalidation of the [challenged] ordinance without payment of fair value for the use of the property during this period of time [between the taking and the invalidation of the challenged ordinance] would be a constitutionally insufficient remedy.
Id. at 322, 107 S.Ct. at 2389. See also Lucas v. South Carolina Coastal Council, ___ U.S. ___, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
The Eleventh Circuit Court of Appeals, citing Joint Ventures, stated, "The Florida courts have recognized that under First Lutheran Church property owners have the right to bring reverse condemnation proceedings seeking compensation for regulatory takings." Executive 100, Inc. v. Martin County, 922 F.2d 1536, 1542 (11th Cir.1991).
[2] Other courts have also invalidated reservation schemes. See, e.g., Urbanizadora Versalles, Inc. v. Rivera Rios, 701 F.2d 993 (1st Cir.1983) (holding that the freezing of property pursuant to the filing of a map, without the condemnation of the land, amounted to an unconstitutional deprivation); Maryland-National Capital Park & Planning Comm'n v. Chadwick, 286 Md. 1, 405 A.2d 241 (1979) (holding that the Commission's action placing the landowner's property in public reservation which restricted any reasonable use of that property for up to three years, was tantamount to a "taking" in a constitutional sense); Lackman v. Hall, 364 A.2d 1244 (Del. Ch. 1976) (finding that a statute authorizing the establishment of prospective highway right-of-way areas and restricting improvements within those areas which would increase the cost to the state if it decided in the future to condemn, constituted an improper exercise of power of eminent domain).
[3] The arguments usually give illustrations such as: if a drunk driver races through town but hits no one there is no civil cause of action or if a tree falls in the forest and no one is there to hear it, does it make a sound?
[4] Because a claim may sound in tort does not prevent it from being "nothing less than a claim of inverse condemnation, which clearly is meritorious." In re Forfeiture of 1976 Kenworth Truck, 576 So.2d 261, 263 (Fla. 1990).
[5] Section 13.17 Blight (Threat of Condemnation) of Florida Eminent Domain Practice and Procedure, 4th Ed., May, 1992 Supp., provides:

In Joint Ventures, Inc. v. Dept. of Transportation, 563 So.2d 622 (Fla. 1990), the Supreme Court held that the map of reservation statute, F.S. 337.241, was a facially unconstitutional taking of private property without full compensation. The statute, at subsection (2) and (3), permitted the state to record a map for future right of way needs on a site-specific basis. Recording of the map prohibited all development of lands subject to the map. The court ruled that a regulation that "froze" property in order to depress its value of anticipation of future condemnation was unconstitutional and a per se taking.
The decision of Orlando/Orange County Expressway Authority v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA 1991), rev. denied, 591 So.2d 183, builds on the Joint Ventures doctrine and is in accord with the United States Supreme Court's view in Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), to the effect that once a showing of "no legitimate state interest" has been made, there is no requirement to demonstrate market loss or economic harm in order for a taking to be found by summary judgment. "[T]hus, in order to establish a taking, Agrigrowth need only show that the Authority's action in recording the reservation map invaded some property right of Agrigrowth." W & F Agrigrowth-FernField, Ltd., supra, at 792.
[6] And even if the statute required the maps to be filed, the result is still state action.
[7] When the government contemplates eminent domain proceedings any governmental action that impairs the use or market value of private property in order to reduce the amount of future compensation to the owner is wrong. See Board of Commissioners of State Institutions v. Tallahassee Bank and Trust Co., 108 So.2d 74 (Fla. 1st DCA 1958). An individual doing the same act for the same purpose would find himself the defendant in a law action of many counts (including conspiracy, slander of title, civil theft, fraud, interference with business relationships), seeking punitive as well as compensatory damages. Many RICO convictions are based on less egregious conduct. In Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1927), Justice Brandeis, dissenting, wrote:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example... .
[8] It only gives the acting state agency attempting to avoid moral and legal responsibility for its act the weak excuse that, "We were only doing what the legislature said we could do. We didn't know the courts were going to hold the statute unconstitutional."
[9] It is very doubtful that the State's action to "withdraw" the recorded map or filing a disclaimer can effectively "unrecord" the map of reservation or its effect in the marketplace. Notice gives knowledge which remains after the notice no longer exists. Just as one cannot "unring" a bell, one cannot take back the knowledge once given by a "notice". The map of reservation continues to constitute a threat of contemplated eminent domain proceedings and to blight the title and impair the vendibility of the property even after the map is withdrawn. The cat cannot be put back into the bag because once a harm, or a threat of harm, is understood, the knowledge of it causes apprehension which has a life of its own and lives after the source of the original notice no longer exists.
[10] It should be noted that the dissenting opinion in Farrar v. Hobby, supra, concluded that the reasonableness issue was not before the Court and that the only point on appeal was the one regarding whether petitioners were prevailing parties. The dissenting opinion would have remanded for further proceedings including the assessment of a reasonable fee.
[11] Justice O'Connor in her concurring opinion characterized such success as "purely technical or de minimis." Farrar, ___ U.S. at ___, 113 S.Ct. at 576.
[12] County of Volusia v. Pickens, 435 So.2d 247 (Fla. 5th DCA) pet. for rev. denied, 443 So.2d 980 (Fla. 1983).